IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DARRYL SMITH,

        Plaintiff,

vs.

ANNETTE CHAMBERS-SMITH, et al.

        Defendants.

CASE NO. 1:24-cv-505

MAGISTRATE JUDGE
JAMES E. GRIMES JR.

**MEMORANDUM
OPINION AND ORDER**

Plaintiff Darryl Smith is a vexatious litigator who has "engaged in 'a clear pattern of … bringing frivolous suits against government officials.'" Doc. 80, at 2 (quoting *Smith v. Pinkney*, No. 1:18-cv-163, 2018 WL 4773551, at *4 (N.D. Ohio Oct. 3, 2018)). The Sixth Circuit previously sanctioned Smith for his "repeated filings and … highly scurrilous and libelous accusations," describing his overall conduct as "inappropriate and even reprehensible." *Smith v. Lockman*, 78 F.3d 585 (Table), 1996 WL 99365, at *1 (6th Cir. 1996). More recently, another judge in this District barred Smith from bringing a *pro se* suit "against a federal, state, or local government or its officials … without first obtaining leave of" the judge. *Smith*, 2018 WL 4773551, at *5.

Still, while incarcerated at the Mansfield Correctional Institution Mansfield, Smith brought this 42 U.S.C § 1983 action against multiple employees of the Ohio Department of Rehabilitation and Corrections ("ODRC"), including: Annette Chambers-Smith, Timothy McConahay, James

Kennard, Lisa Booth, Dana Blankenship, Matthew Murrin,[1] and Christopher Lambert. Doc. 6. Because Smith filed his complaint with the assistance of counsel, he avoided application of his vexatious-litigator bar in this case. *See* Doc. 80, at 3.

After this Court granted Defendants' motions to dismiss in part and denied them in part, Doc. 34, Defendants moved for summary judgment on all remaining claims, Doc. 91. Smith, now *pro se*, did not respond to the motion, but he had separately moved for summary judgment and for a preliminary injunction compelling law library access at Mansfield.[2] Doc. 68. Smith has since been released from custody. Doc. 87.

For the reasons stated below, this Court grants Defendants' motion for summary judgment and denies Smith's motion for preliminary injunction as moot. In light of the Court's decision granting Defendants' summary judgment, Smith's motion for summary judgment is also denied.

---

[1] Smith's amended complaint and Defendants' motion for summary judgment both spell this defendant's name as "Murin." Yet because Murrin's own report spells his name as "Murrin," *see* Doc. 91-2, at 22, the Court adopts that spelling.

[2] Although Smith titled this motion both as a motion for summary judgment and for a preliminary injunction, Doc. 68, at 1, the motion contained no discussion of summary judgment standards. In response, this Court reminded Smith that parties may file only one summary judgment motion and ordered him to file a "one-page notice confirming whether [Smith] intend[ed] this motion to include his sole motion for summary judgment." Because Smith did not file any notice in response to the order, the Court treats his motion for preliminary injunction as including a motion for summary judgment.

*1. Background Facts*[3]

*1.1. Smith's Transfer to Mansfield*

In November 2021, while incarcerated at Trumbull Correctional Institution, Smith applied for a protective control placement. Doc. 90, at 23–24. ODRC records reflect that Smith demonstrated "a pattern of disruptive behavior" at a prior institution and was "found planting a weapon on another inmate." Doc. 91-4, at 1. In support of his request for protective custody, Smith explained that he was "in fear of his life" because he had served as a police informant and witness against other inmates in criminal cases. Doc. 91-4, at

---

[3] As the Supreme Court has explained, once a defendant moving for summary judgment shows the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, who must cite "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To meet this burden, the nonmoving party must "cit[e] *particular* parts of materials in the record" to support any "asserti[on] that a fact" asserted by the defendant "is genuinely disputed." Fed. R. Civ. P. 56(c)(1) (emphasis added).

Because Smith did not file a response to Defendants' motion for summary judgment, this Court finds it appropriate to treat Defendants' supported "assertion[s] of fact" as "undisputed for purposes of [the summary judgment] motion." Fed. R. Civ. P. 56(e)(2); *see Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 345 (6th Cir. 1984) (explaining that a plaintiff's allegations in the complaint, standing alone, do not create a question for a jury); *see also Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) ("[T]here is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact'").

6. Smith specifically named two inmates who posed potential threats to him. Doc. 91-4, at 6.

A later investigation revealed that one named inmate was on death row at the Chillicothe Correctional Institution, and the other, Antonio Houston, was serving his sentence at Mansfield. Doc. 91-4, at 5. The investigator also noted that the ODRC classified Houston as a prison gang member "with a passive participation level." Doc. 91-4, at 4. Based on these findings, the warden at Trumbull approved Smith for protective custody and requested an authorization from the ODRC. Doc. 91-4, at 2, 6.

Rather than placing Smith in protective custody at Trumbull, however, ODRC officials transferred him to Mansfield and housed him in general population. Doc. 90, at 25; Doc. 91-4, at 2. Smith wrote numerous letters to the ODRC director, Chambers-Smith, challenging his transfer. Doc. 90, at 27. He also spoke to McConahay, the warden at Mansfield, "at least two or three times, face to face," regarding protective custody. Doc. 90, at 26.

*1.2 March 2022 Altercation*

In March 2022, Daniel Williams was Smith's cellmate at Mansfield. Doc. 90, at 65. On March 15, 2023, Smith sent a hand-written "kite" message to Kennard, who was his unit manager, reporting that Williams threatened to stab Smith with a "knife weapon," which is "a large red spork of hard plastic … sharpened to a point." Doc. 68-60, at 1. That same day, Smith mailed another kite to Booth, who was an institutional inspector, stating that

Williams brandished "a knife – a spork sharpened to a point" and threatened Smith "to move out of the cell by Friday." Doc 68-58, at 1. Smith also wrote to Chambers-Smith, complaining that Williams was a "drug addict" with "a clear record of violence and assaults" who threatened to stab Smith with a knife and demanded that Smith move out of the cell. Doc. 68-61. The day after, Smith wrote to McConahay, reiterating the same allegations that he had made to Booth. *See* Doc. 68-59, at 1. Nonetheless, Smith denies ever requesting protective custody out of fear of Williams. Doc. 90, at 66–67.

On Friday morning, March 18, 2022, Smith sent Kennard an electronic kite message, stating, "call me over to your office TODAY if possible, my cellie has been brewing wine and the other [night] made a knife he stashed out of the cell." Doc. 68-56, at 1. Smith alleges that Kennard then came into Smith's cellblock, but "blew [Smith] off and told [him] to 'stop snitching.'" Doc. 68-62, at 1.

That night, Murrin "responded to what sounded like a cell fight" at Smith's cell. Doc. 91-2, at 22. As Murrin approached the cell's window, he heard Smith saying, "Get me out, he tried to stab me," while holding an unsharpened "plastic spork with two of the prongs broken off." Doc. 91-2, at 22; *see also* Doc. 91-2, at 61 (picture of the spork). Murrin also saw Williams standing near the window. Doc. 91-2, at 22. Murrin told Smith to kick the spork under the cell door, and Smith complied. Doc. 91-2, at 22. Murrin and other officers then separated Smith and Williams. Doc. 91-2, at 22.

Soon thereafter, a nurse examined Smith and treated his injuries. Doc. 91-2, at 37. The nurse noted a slight bleeding from a "puncture wound" on Smith's wrist, as well as an injury to his left bicep that rendered Smith "unable to curl elbow and touch [his] shoulder[.]" Doc. 91-2, at 37. The nurse cleansed the puncture wound with saline, applied a bandage, wrapped Smith's left bicep, and provided medication for discomfort. Doc. 91-2, at 37. Two weeks later, Smith returned complaining of a "possible bicep tear" from the assault, but a different nurse, Jodie Slone, observed only "yellow bruising" on his left bicep. Doc. 91-6, at 1. Smith also had a "full range of motion" and did not show any weaknesses in his limbs. Doc. 91-6, at 2.

Smith and Williams provided conflicting accounts of the March 2020 incident. Doc. 91-2, at 56. According to Smith, Williams suddenly attacked him with a knife while Smith was "sitting on [his] bed" and "watching [a] game on [his] TV." Doc. 91-2, at 56. The altercation continued until Smith "yanked [the knife] out of [Williams's] hand" and called for help. Doc. 91-2, at 56. Smith denied saying or doing anything to provoke Williams before the attack, instead claiming that Williams had simply "hated" him. Doc. 91-2, at 56. On the other hand, Williams claimed that Smith initiated the fight by attempting to stab him with "a sharpened spork." Doc. 91-2, at 52. Williams further stated that when officers arrived, Smith told Williams, "You just caught a case." Doc. 91-2, at 52. Although Smith was charged with prison-rules infractions, a Rules

6

Infraction Board ultimately found him not guilty of any charges. Doc. 91-2, at 41.

> *1.3 April 2022: Confiscation of Legal Materials and Grievance Restriction*

After the altercation with Williams, Smith was reassigned to a different non-protective custody unit. Doc. 6, at 54. Smith sent a string of correspondence to Chambers-Smith, Kennard, and Booth, accusing the ODRC employees of covering up the assault incident. *See, e.g.*, Doc. 68-53; Doc. 68-54.

In April 2022, Smith reported to Booth that his "2.4 box full of legal materials … on pending court appeals and cases," including "several expensive lawbooks," had disappeared. Doc. 68-45, at 16. Booth later found the box and conducted an inventory, during which she discovered multiple legal materials in other inmates' names. Doc. 91-2, at 25–26. Blankenship, who was another institutional inspector, explained in an unsworn declaration that inmates are only permitted to keep in their cells legal materials related to their own active cases. Doc. 91-5, at 3. Booth also found a legal book that was not "not purchase[d] through approved ODRC methods" and had another person's name on it. Doc. 91-2, at 25. Booth confiscated those items as contraband. Doc. 91-2, at 25. Smith claims that Booth then ordered him to consent to have the items destroyed, but Smith refused and threatened to sue. Doc. 6, at 10; *see also* Doc. 91-2, at 26. As a result, Smith received multiple disciplinary tickets related to contraband and threats. Doc. 91-2, at 25–26. The Rules Infraction Board later found Smith guilty of contraband possession. Doc. 91-2, at 43.

Later in April 2022, Smith was placed on a 90-day grievance restriction after repeatedly filing 10 grievances regarding the March 2022 incident. Doc. 91-5, at 2. Smith also received a letter from Lambert, who was Mansfield's chief inspector, stating that while "[a]ny issue [Smith] ha[s] must be presented first to the inspector's office via kite, … [he] will be permitted unrestricted access to the kite system" and "will also have staff available to [him], as they make rounds daily." Doc. 91-2, at 17. According to Blankenship, an inmate should submit only one grievance for a specific incident or issue, and Smith was "not permitted to file numerous grievances regarding the same incident."[4] Doc. 91-5, at 2. Blankenship also explained that Smith had received a warning about the restrictions but did not stop filing grievances. Doc. 91-5, at 2. Blankenship further confirmed that the subject matter of Smith's grievances "had absolutely no bearing on the …. restriction" and Smith's repetitive filings were the only basis for the restriction. Doc. 91-5, at 2. During the restriction, according to Blankenship, Smith could still submit a kite to report an issue or to request a permission for filing a grievance. Doc. 91-5, at 2–3.

---

[4]     Defendants' motion for summary judgment contains multiple unsworn declarations from Blankenship and other witnesses. *See* Doc. 91-1; Doc. 91-3; Doc. 91-5; Doc. 91-6; Doc. 91-7. An unsworn declaration may substitute for a conventional affidavit if the statement in the declaration was made under penalty of perjury, certified as true and correct, dated, and signed. 28 U.S.C. § 1746; *see also Pollock v. Pollock*, 154 F.3d 601, 612 (6th Cir. 1998). Here, in each attached unsworn declaration, the declarant "make[s] the … unsworn declaration under penalty of perjury that the [statement] is true and correct." *See, e.g.*, Doc. 91-1, at 3. The declarations are also signed and dated. It is therefore proper for this Court to consider the unsworn declarations in the record.

*1.4 September 2023 Attack and Another Grievance Restriction*

In September 2023, Christopher Adams, another Mansfield inmate, struck Smith in a hallway. Doc. 91-2, at 24; Doc. 90, at 98. Smith did not know why Adams struck him or that Adams was going to strike him. Doc. 90, at 98. Smith never warned Defendants that Adams might attack him. Doc. 90, at 98–99. Indeed, Smith claims that he never met or spoke to Adams before the September incident. Doc. 6, at 11. During a later medical exam, Smith appeared "fully conscious." Doc. 91-7, at 2. Indeed, he refused an exam, denying any injury or pain. Doc.91-2, at 27; Doc. 91-7, at 1. The examining nurse confirmed that Smith showed no bleeding, physical injuries, or "signs or symptoms of a concussion or other head injury." Doc. 91-7, at 1.

Later that month, Smith was again placed on a 90-day restriction after filing multiple grievances with the office of the chief inspector. Doc. 90, at 99; Doc. 91-5, at 2. As with his earlier restriction, Smith received the same notice regarding "unrestricted access to the kite system" and "staff available to [him]." Doc. 91-2, at 21. Blankenship explained that the ODRC policies require an inmate to submit a grievance directly to the chief inspector "only if the grievance relates to an institution's warden or institutional inspector" and Smith was placed on the restriction for failing to follow these requirements. Doc. 91-5, at 2.

*2. Preliminary Injunction*

This Court addresses Smith's motion for preliminary injunction as a threshold matter. *See* Doc. 68. "A preliminary injunction 'is an extraordinary equitable remedy' that serves 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,162 F.4th 631, 637 (6th Cir. 2025) (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024)). In determining whether to grant a preliminary injunction, a court must consider whether the movant has established: (1) a "strong" likelihood of success on the merits; (2) that the movant will suffer irreparable injury absent injunctive relief; (3) that the balance of the equities favors the movant; and (4) that the public interest would be served by granting the injunction. *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022); *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). The decision to grant or deny a preliminary injunction is within the sound discretion of a district court. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009).

This Court need not address each of the preliminary injunction factors because Smith's motion is moot. An issue becomes moot "if, assuming that the plaintiff receives the relief which he or she requests, such relief would no longer afford any meaningful legal benefit." *Gao v. Jenifer*, 185 F.3d 548, 557 (6th Cir. 1999). In his motion, Smith asks that this Court "compel Defendants … provide to [him] law library access and use as required by law[ ]." Doc. 68, at 1. He

further asks that the Court order Defendants to accommodate his alleged hearing and vision disabilities under the Americans with Disabilities Act. Doc. 68; *see* 42 U.S.C. §§ 12131–12134. Since filing this motion, however, Smith has been released from Mansfield and is no longer in ODRC's custody. Doc. 87. An inmate's claim for injunctive relief regarding his confinement condition becomes moot once the inmate is released from confinement. *See, e.g.*, *Lamb v. Bumpus*, 52 F. App'x 740, 741 (6th Cir. 2002); *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). The Court thus denies Smith's motion for preliminary injunction as moot.

### 3. Summary Judgment

#### 3.1 Legal Standards

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party may, but need not, "produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). As an alternative, the moving party may "discharge[]" its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

A party asserting that a fact is in genuine dispute, i.e., the party opposing summary judgment, must do more than simply say that it is so. *See Bennett v. Louisville Metro Gov't*, 616 F. App'x 820, 823 (6th Cir. 2015); Fed. R.

Civ. P. 56(c)(1). A party asserting a genuine dispute of fact must support his assertion with "cit[ations] to *particular parts* of materials in the record" or he must show either that his opponent's evidentiary "materials … do not establish the absence … of a genuine dispute, or that [the movant] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1) (emphasis added); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). And "[i]f a party … fails to properly address another party's assertion of fact," this Court has the discretion to "consider the fact undisputed for purposes of the motion" and, if otherwise appropriate, grant summary judgment. Fed. R. Civ. P. 56(e); *see Ghandi*, 747 F.2d at 345 ("Plaintiffs … are not entitled 'to get to the jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial'") (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968)).

Because Smith is unrepresented, the Court is obligated to construe liberally his pleadings and filings. *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999). This liberal-construction requirement, however, "do[es] not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted). A party's *pro se* status, therefore, does not mean that Rule 56's requirements do not apply. *See Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *Myers v. Shelly Co.*, No. 24-cv-0792, 2026 WL 653640, at *3 (N.D. Ohio Mar. 9, 2026); *see also  Zainalian v. Memphis Bd. of Educ.*, 3

12

F. App'x 429, 431 (6th Cir. 2001) (affirming a grant summary judgment, noting that because the *pro se* plaintiff "neither verified his affidavit nor complaint, signed them under oath, nor signed them under penalty of perjury ..., the facts averred to therein lacked the force and effect of an affidavit for purposes of responding to a motion for summary judgment").

### 3.2 Discussion

Defendants move for summary judgment on all 12 claims that remain pending before this Court.[5] Defendants argue that they are entitled to qualified community because Smith established no violation of his constitutional rights. Doc. 91, at 18. The success of Defendants' summary judgment motion is, therefore, contingent upon the merits of Smith's constitutional claims. *See Fettes v. Hendershot*, 375 F. App'x 528, 531 (6th Cir. 2010) ("To determine whether qualified immunity was properly granted [or denied], this court examines … whether a constitutional right has been violated.").

For organizational purposes, this Court breaks down these claims into three categories: (a) Eighth Amendment non-medical deliberate indifference

---

[5]    The following claims survived dismissal: (i) Count 1 against Chambers-Smith and McConahay; (ii) Count 2 against Kennard; (iii) Count 3 against Chambers-Smith, McConahay, and Booth; (iv) Count 4 against Murrin; (v) Count 5 against Chambers-Smith, Booth, and Lambert; (vi) Count 6 against Chambers-Smith, Booth, and Lambert; (vii) Count 7 against Booth and Lambert; (viii) Count 9 against Chambers-Smith, McConahay, Kennard, and Booth; (ix) Count 10 against unspecified Jane Doe Nurse; (x) Count 11 against Chambers-Smith, Blankenship, and Lambert; (xi) Count 12 against Chambers-Smith, Blankenship, and Lambert; and (xii) Count 13 against Chambers-Smith, Blankenship, and Lambert. *See* Doc. 34, at 28 n.13.

13

claims (Counts 1, 2, 3, 4, and 9); (b) Eighth Amendment medical deliberate indifference claims (Count 10, 11); and (c) First Amendment claims (Counts 5, 6, 7, 12, 13). Each are addressed in turn below.

### 3.2.1 Non-Medical Deliberate Indifference Claims

### 3.2.1.1 Relevant Law

The first category of Smith's claims involves the Eighth Amendment's prohibition of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "requires prison officials to 'ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates.'" *Zakora v. Chrisman*, 44 F.4th 452, 467 (6th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). According to the Supreme Court, the Eight Amendment also requires "prison officials … to protect prisoners from violence at the hands of other prisoners," but this requirement does not mean that "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials." *Farmer*, 511 U.S. at 833–34. Rather, [a] prison official violates an inmate's rights … only if the official is 'deliberate[ly] indifferen[t] to inmate health or safety.'" *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 726 (6th Cir. 2022) (quoting *Farmer*, 511 U.S. at 834).

A deliberate indifference claim against a prison official under the Eighth Amendment, has both an objective and a subjective component. *Westmoreland*, 29 F.4th at 726. To show deliberate indifference, a plaintiff must first

"objectively" be "'incarcerated under conditions posing a substantial risk of serious harm.'" *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021) (quoting *Farmer*, 511 U.S. at 834). To satisfy this objective prong, an inmate must provide sufficient evidence to show that the risk of harm was "objectively sufficiently serious." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011).

Next, to satisfy the subjective prong, the inmate must demonstrate that the prison official acted with "deliberate indifference" to inmate safety. *Reedy*, 988 F.3d at 912; *see Beck*, 969 F.3d at 600. "An official is deliberately indifferent if he or she '*knows of and disregards* an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'" *Bishop*, 636 F.3d at 766–67 (emphasis added) (quoting *Farmer*, 511 U.S. at 837). Accordingly, "[t]he failure to alleviate a significant risk that an officer 'should have perceived but did not' is insufficient for a claim of deliberate indifference." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 483 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 838).

### 3.2.1.2 Non-medical Deliberate Indifference Analysis

With these principles in mind, the Court turns to the merits of Smith's deliberate indifference claims.

15

> 1. Counts 1 & 2: Defendants were not deliberately indifferent when initially placing Smith in general population at Mansfield.

Smith initially argues that McConahay and Chambers-Smith violated the Eighth Amendment by placing him in general population at Mansfield and ignoring Trumbull's protective custody approval. Doc. 6, at 12. Indeed, the record offers no clear explanation for Smith's transfer to Mansfield despite the outstanding protective custody order. According to Kasey Plank, the warden's assistant at Mansfield, when an inmate is approved for protective custody, the warden may "simply transfer[] the [inmate] to another institution where the underlying threat or safety concern is alleviated." Doc. 91-1, at 3. Plank further explained that Smith was transferred to Mansfield "because of a potential threat posed by two [inmates] at Trumbull." Doc. 91-1, at 3. But this explanation does not match the record. In approving Smith's protective custody request, Trumbull's warden made no mention of "two [inmates] at Trumbull" as the basis for the transfer. Doc. 91-4, at 6. Instead, the warden noted that Smith had identified two inmates *outside* Trumbull as potential threats to his safety, including Houston, who was housed at Mansfield. Doc. 91-4, at 5. Accordingly, even if ODRC policy authorizes a transfer to an institution where safety concerns would be alleviated, Smith's transfer to Mansfield would place him in the very facility that houses his identified threat.

To the extent that a factual dispute exists over the reason for Smith's transfer to Mansfield, however, that dispute is immaterial to Smith's claims.

16

*See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). As this Court understands it, Smith's deliberate indifference claim targets Defendants' failure to place him in protective custody *after* his arrival at Mansfield, not the transfer itself. *See* Doc. 6, at 90. Furthermore, even if Smith could objectively show that his placement at Mansfield posed a substantial risk of serious harm, he failed to show that Defendants had actual knowledge of the risk. *See Bishop*, 636 F.3d at 766–67 (explaining that "[a]n official is deliberately indifferent if [the official] knows of and disregards an excessive risk to inmate health or safety") (internal quotation marks omitted); *accord. Rogers v. MacClaren*, No. 1:20-cv-263, 2020 WL 3481541, at *8 (W.D. Mich. June 26, 2020) (dismissing an Eighth Amendment claim that prison officials should have known a risk from the plaintiff's unit placement). Indeed, the record demonstrates that Mansfield personnel exercised no control over Smith's transfer from Trumbull and were unaware of Smith's protective custody status when Smith arrived. *See* Doc. 91-1, at 3.

Defendants' subsequent denial of protective custody at Mansfield also does not show deliberate indifference. Smith claims that Defendants knew— but disregarded—his repeated requests for protective custody. Doc. 6, at 12, 13; *see also* Doc. 90, at 25–27. Even so, Smith failed to meet the objective component because he presented no evidence that his placement in general

17

population gave rise to a substantial risk of serious harm. Aside from Smith's fear for his own safety, the record contains no evidence that Houston even knew of Smith's incarceration at Mansfield. And although Smith emphasizes Houston's membership in a prison gang, *see* Doc. 6, at 6; Doc. 91-2, at 62, he does not allege that Houston or the gang ever injured him physically or psychologically. *See Yaklich v. Parks*, 148 F.3d 596, 601 (6th Cir. 1998). Nor is there any evidence or allegation that Houston had identified Smith as a police informant to any other inmates. *See Thompson v. Mich. Dep't of Corr.*, 25 F. App'x 357, 359 (6th Cir. 2002). In sum, Smith has failed to establish that he was particularly vulnerable to attack from other inmates, much less that Defendants knew of that vulnerability. *Compare Schoonover v. Rogers*, No. 21-3970, 2022 WL 12258998, at *5 (6th Cir. Oct. 21, 2022) ("A general vulnerability to attack is normally insufficient for an Eighth Amendment claim."), *with Bishop*, 636 F.3d at 766, 771 (finding deliberate indifference where prison officials knew the "small," "mentally 'slow,'" nineteen-year-old plaintiff could be "especially vulnerable to sexual pressure" and yet placed him "in a cell with an older, stronger, and predatory inmate"), *and Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (finding deliberate indifference in placing a known transgender with a violent, predatory inmate where officials were aware transgender inmates faced high risk of assault).

18

2. Counts 2 & 3: Defendants were not deliberately indifferent
in failing to prevent the March 2022 assault by Williams.

Smith next argues that Defendants were deliberately indifferent when they took "no action" to address the risk of serious harm posed by Williams. Doc. 6, at 13. An inmate, however, cannot establish a deliberate indifference claim under Eighth Amendment "with references to vague or generalized threats that are not supported by any substantiating facts." *Chappell v. Woods*, No. 1:17-cv-00080, 2019 WL 1305859, at *2 (S.D. Ohio, Mar. 22, 2019) (emphasis added). Furthermore, "[a]n inmate's mere insistence of danger, even if expressed to Defendants, does not show that Defendants subjectively perceive[d] a real threat." *Hall v. Cole*, No. 2:23-cv-28, 2025 WL 2318472, at *3 (W.D. Mich. Aug. 12, 2025) (internal quotation marks omitted). This is particularly true where an inmate relays to a prison official "only the most general allegations" of a threat. *Stewart v. Love*, 696 F.2d 43, 45 (6th Cir. 1982). Because "threats between inmates are common," they "do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Varmado-El v. Martin*, 52 F. App'x 764, 765–66 (6th Cir. 2002).

In *Reedy*, the Sixth Circuit affirmed summary judgment on an inmate's deliberate indifference claim. 988 F.3d 907. There, a cellmate repeatedly threatened Reedy, causing Reedy to fear for his safety. *Id.* at 913. Weeks later, Reedy briefly spoke with the defendant, who was a prison counselor, about the cellmate's threats. *Id.* at 910. The defendant then met with the cellmate, who stated that he was "going to do what he's got to do" if the prison officials did

19

not move the plaintiff to another cell, and "whatever happens … is going to be onto [the defendant]." *Id.* at 910, 911. After the meeting with the cellmate ended, however, the defendant allegedly assured Reedy that "[the cellmate] ain't going to do nothing." *Id.* at 910. A day later, the cellmate attacked Reedy while in his sleep. *Id.* at 911.

The Sixth Circuit held that Reedy failed to meet the objective component of the deliberate indifference test. The court highlighted Reedy's testimony that his relationship with his cellmate was "[f]or the most part … good." *Id.* at 913. Nor was there any evidence that the cellmate had previously harmed Reedy or that he had a history of physical violence in prison. *Id.* Reedy also did not belong to a class of prisoners who were particularly vulnerable to assault. *Id.* at 915. In addition, because the last threat made by the cellmate occurred about a month before the assault, the Sixth Circuit concluded that there appeared to be no substantial risk of serious harm when the cellmate claimed, "whatever happens … is going to be onto [the defendant]." *Id.* at 913. Holding otherwise, the Sixth Circuit noted, would require prison officials "to move any inmate [who] … threatens that *something* might happen if his demands for a cell change are not met." *Id.* (emphasis in the original).

The Sixth Circuit also held that Reedy likewise failed to establish the subjective component. *Id.* at 914. The defendant was not assigned to Reedy, did not regularly see Reedy, and did not "really have a relationship with" Reedy. *Id.* Reedy's evidence regarding the defendant's subjective knowledge

20

rested on two brief conversations, during which Reedy vaguely asserted that he feared for his safety or that the cellmate had threatened him. *Id.* The Sixth Circuit concluded that the defendant's "brief exposure to Reedy's alleged plight" did not give the defendant "enough personal contact with [Reedy] to be subjectively aware" of any safety risk posed by the cellmate. *Id.* Finally, with regard to the cellmate's threatening remarks—including that he was "going to do what he's got to do"—the Sixth Circuit concluded that these threats do not necessarily impute actual knowledge of a risk of harm to prison officials. *Id.* at 915 (citing *Varmando-El*, 52 F. App'x, at 765–66).

Applying *Reedy* to this case, there is no genuine dispute of material fact regarding Smith's deliberate indifference claim. Objectively, Smith was not "incarcerated under conditions posing a substantial risk of serious harm" at the time of the March 2022 assault. *Farmer*, 511 U.S. at 834; *Reedy*, 988 F.3d at 912. As explained, there is no evidence that Smith belonged to "a class of prisoners particularly vulnerable to assault" due to his physical characteristics or other personal traits. *Reedy*, 988 F.3d. at 915; *Schoonover*, No. 21-3970, 2022 WL 12258998, at *6. The record also contains no evidence that Williams ever harmed or injured Smith before the incident. To the extent Smith reported that Williams threatened to stab Smith with a "knife weapon," Doc. 68-60, at 1, and demanded that Smith move out of the cell, Doc. 68-58, at 1, these allegations are "conclusory statements unadorned by any supporting facts," *Reedy*, 988 F.3d at 913; *see Perry v. Warden Warren Corr. Inst.*, No. 1:20-cv-30, 2022 WL

21

3369662, at *8 (S.D. Ohio Aug. 16, 2022) (finding that the plaintiff's statements to prison officials about his cellmate's threats and sexual advances were "conclusory and not supported by any other evidence of the record"), *report and recommendation adopted*, 2022 WL 4493913 (S.D. Ohio Sept. 28, 2022). Indeed, as if to highlight Smith's failure to satisfy the objective prong, the alleged "knife weapon" later turned out to be an unsharpened spork with broken prongs. Doc. 91-2, at 22; Doc. 91-2, at 61.

Moreover, even viewing the record in the light most favorable to Smith, no reasonable jury could find that Defendants subjectively perceived an excessive risk to Smith's safety posed by Williams. First, Smith notified Chambers-Smith, McConahay, and Booth about Williams's threats by sending *handwritten*, rather than electronic, correspondence just two or three days before the March 2022 assault. *See Lawrence v. Coffee Cnty. Sheriff's Dep't*, No. 4:16-cv-12, 2019 WL 1244704, at *5 (E.D. Tenn. Mar. 18, 2019) (noting "three day is not an excessive amount of time between the filing of the grievance and the response"). As a result, these Defendants could not have known of Williams's threats towards Smith until they physically received Smith's correspondence.

As for Kennard, who received an electronic kite message on the morning of the assault, the message did not identify any risk of harm. Instead, it merely stated that Williams had "been brewing wine and made a knife." Doc. 68-56, at 1; *see Stewart*, 696 F.2d at 45 (finding the subjective prong not satisfied

22

when the inmate reported "only the most general allegations that 'someone was going to get hit on the head'"). And although there is evidence that Smith told Kennard on the morning of the attack that Williams "had [a] knife and threatened to stab" Smith, Doc. 68-1, at 4, Smith points to no evidence that Williams was predatory, had a history of violence, or had harmed Smith in the past. *See Branch v. Wilson Cnty. Jail*, No. 3:23-cv-00523, 2025 WL 2990659, at *5–6 (M.D. Tenn. Oct. 23, 2025) (relying on the absence of similar evidence). Given the absence of such evidence, the fact Smith relayed Williams's alleged threat is not enough, by itself, to show that Smith "was exposed to an objectively serious risk of harm." *Id.* at *5; *see Reedy*, 988 F.3d at 915 ("[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm.'") (quoting *Varmado-El*, 52 F. App'x at 765-66).

Indeed, barring Smith's unsubstantiated assertion that Williams was a "drug addict" with "a … record of violence and assaults," Doc. 68-61, the record shows no evidence that Williams had been convicted of violent offence, had a history of assaulting other prisoners, or had engaged in any violent behavior before the March 2022 assault, *see Grossman v. Federea*, No. 1:24-cv-623, 2025 WL 3964445, at *5 (W.D. Mich. Dec. 1, 2025); *see also Lyons v. Holden-Selby*, 729 F. Supp. 2d 914, 920 (E.D. Mich. 2010) (denying summary judgment when prison officials had "expressly noted that [the plaintiff's cellmate] was a threat to other inmates" but disregarded reports of the cellmate's threats to the

23

plaintiff). Nor did Smith ever identify Williams as a significant threat in his protective custody requests, Doc. 90, at 66–67, and Defendants thus could reasonably infer that housing the two together posed no substantial risk of harm. *See Grossman*, 2025 WL 3964445, at \*5; *see also Farmer*, 511 U.S. at 844 (explaining that prison officials do not violate the Eighth Amendment when "they knew the underlying facts but [incorrectly] believed … that the risk to which the facts gave rise was insubstantial or nonexistent"). In fact, far from establishing Williams's dangerousness, the record reveals that Smith was the one with a documented history of "disruptive behavior," who had previously "planted a weapon on another inmate." Doc. 91-4 at 1.

> 3. Count 4: Murrin was not deliberately indifferent when he failed to intervene during the March 2022 assault.

Smith's next claim is that Murrin demonstrated deliberate indifference by failing to intervene in the March 2022 assault. "[P]rison officials have a duty [under the Eighth Amendment] to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. There is, however, no bright line rule that defines a correctional officer's constitutional duty during an inmate-on-inmate violence. *See Ontha v. Rutherford Cnty*, 222 F. App'x 498, 506 (6th Cir. 2007) ("[T]he exact contours of what action is constitutionally required of a guard who witnesses an on-going fight among inmates is not clearly defined."); *accord. Watison v. Core Civics Solutions*, No. 1:20-00008, 2022 WL 20613397, at \*8 (M.D. Tenn. July 19, 2022).

24

At one end of the spectrum, officers may be liable when evidence shows that they ignored an "obvious inmate attack." *Watison*, 2022 WL 20613307, at *7; *see Amick v. Ohio Dep't. of Rehab. & Corr.*, 521 F. App'x. 354, 363 (6th Cir. 2013) (finding a plausible claim for deliberate indifference when officers heard inmates in the unit yelling for help but ignored the plea for 30 minutes while an inmate was choked to death by cellmate). At the other end of the spectrum, "prison guards have no constitutional duty to intervene in an armed assault by an inmate when the intervention would place the guard in danger of physical harm." *Patmon v. Parker*, 3 Fed. App'x 337, 338 (6th Cir. 2001). In other words, an Eighth Amendment claim does not arise simply because prison officials fail to intervene immediately in an inmate attack. *See Smith v. Vourhees*, No. 2:23-cv-11490, 2026 WL 1038875, at *7 (E.D. Mich Feb. 4, 2026), *report and recommendation adopted*, 22026 WL 789084 (E.D. Mich. Mar. 20, 2026); *Riley v. Slusher*, No. 3:24-cv-860, 2025 WL 2645897, at *4 (M.D. Tenn. Sept. 15, 2025); *see also Brittain v. Clemons*, 2011 WL 2471587 (W.D. Ky., June 21, 2011) (granting summary judgment based on failure to show subjective intent to cause harm, even assuming that a prison officer delayed for a few minutes before calling for assistance to break up a prison fight).

Here, Smith produced no evidence that Murrin consciously disregarded Smith's plea for help or unreasonably delayed in response to the assault. Doc. 91-2, at 22, 56. The altercation did not last long, and according to Smith's contemporaneous account, Smith had disarmed Williams *before* Murrin

25

arrived. Doc. 91-2, at 56; Doc. 68-55; *see also id.* at 22; Doc. 68-51. As the Sixth Circuit observed, courts are generally "unwilling to impose a duty to intervene where … an entire incident unfolds in a matter of seconds." *Ontha*, 222 F. App'x at 506. Nothing suggests that either inmate sustained a serious injury during the fight. *See* Doc. 91-2, at 53–55, 57–60. Additionally, after securing the spork that Williams had allegedly used, Murrin called for assistance to remove both inmates from the cell, separated them, and checked the inmates for their injuries. Doc. 91-2, at 22. *See Morris v. Ward¸* No. 4:06-cv-13, 2007 WL 951433, at *6 (W.D. Mich. March 27, 2007) (noting that no Eighth Amendment violation occurs when a prison officer "quickly summoned help and assisted in restraining and disarming" fighting prisoners).

Because Smith did not oppose Defendants' motion, he has done nothing to counter the evidence on which Defendants rely. The Court thus considers Defendants' evidence on this issue undisputed. *See* Fed. R. Civ. P. 56(e)(2). Indeed, in his motion for preliminary injunction and summary judgment, Smith does little more than assert that he was stabbed, *see* Doc. 68, without countering his own contemporaneous account, that he had disarmed Williams before Murrin arrived, Doc. 91-2, at 56.

Further, even considering Smith's declaration despite Smith's failure to oppose Defendants' motion, he would fare no better. Although Smith declared that Murrin "cheer[ed] on Williams" during the attack, Doc. 68-1, at 4, "[t]he use of harassing or degrading language by a prison official, although

26

unprofessional and deplorable, does not rise to constitutional dimensions." *Perkins v. Bailey*, No. 1:20-cv-1029, 2021 WL 868887, at *10 (W.D. Mich. Mar. 9, 2021). The Sixth Circuit has repeatedly recognized that "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987); *see also Murray v. United States Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at * 3 (6th Cir. Jan. 28, 1997) ("[T]he Eighth Amendment does not afford [courts] the power to correct every action, statement or attitude of a prison official with which we might disagree."). Accordingly, for summary judgment purposes, Smith has failed to demonstrate a dispute of material fact regarding Murrin's deliberate indifference to Williams's attack with what turned out to be an unsharpened spork.

> 4. Count 9: Defendants were not deliberately indifferent in failing to prevent the September 2023 assault by Adams.

The remainder of Smith's non-medical deliberate indifference claims concerns Defendants' alleged failure to prevent Adams's September 2023 attack. In the amended complaint, Smith alleged that Chambers-Smith, McConahay, Kennard, and Booth "had clear knowledge of the potential risk of serious physical harm" to Smith after the March 2022 attack by Williams, yet they still did not assign him to a protective custody unit. Doc. 6, at 17. Per Smith, denying him protective custody "ultimately led to" the September 2023 attack. Doc. 6, at 17.

27

Yet again, a reasonable juror cannot find either prong of Smith's deliberate indifference claim satisfied here. Recall that a defendant moving for summary judgment need only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. At that point, it is up to a plaintiff to show that there is a genuine dispute of material fact. *See Bennett*, 616 F. App'x at 823; Fed. R. Civ. P. 56(c)(1). And that is what has happened here—Defendants have pointed to the absence of evidence and Smith has not responded. *See* Doc. 91, at 4–5.

Starting with the objective prong, the record contains no evidence that Smith faced a substantial risk of serious harm at the time of the September 2023 assault. Defendants had taken prompt remedial action after the March 2022 assault by separating Smith from Williams and assigned them to different units. Doc. 6, at 9, 17. Smith presents no evidence that he continued to fear for his safety following the reassignment. Indeed, Smith admitted in his deposition that he did not expect Adams's attack and did not know the reason for the attack. Doc. 90, at 98–99.

As to the subjective prong, Smith never alerted Defendants to any risk of harm posed by Adams. Doc. 90, at 98–99. Nor is there any evidence that Adams's attack was related to any other threats previously identified by Smith. The Sixth Circuit has held that "'an isolated or occasional attack'" generally does not suffice to show an Eighth Amendment violation. *Swarts v. Johnson*, 826 F.2d 1065 (Table), 1987 WL 38543, at *1 (6th Cir. 1987) (quoting *Stewart*,

28

696 F.2d at 45); *see also McDuff v. Addis*, No. 1:17-cv-912, 2018 WL 3239491 at *3 (W.D. Mich. July 3, 2018) ("Generally, a single isolated attack on an inmate cannot give rise to a deliberate indifference claim because the inmate will be unable to show that officials were consciously aware of the risk of an attack."). Because Defendants had no prior knowledge of any risk of harm posed to Smith by Adams, and because Smith's injury resulted from a random attack by an inmate with whom Smith denies any prior history, there is no basis for finding that Defendants subjectively perceived or consciously disregarded the risk. Defendants are entitled to summary judgment on this claim.

### 3.2.2 Medical Deliberate Indifference Claims

#### 3.2.2.1 Relevant Law

In the medical context, the objective prong of a deliberate indifference claim "requires the existence of a 'sufficiently serious' medical need." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Blackmore v. Kalamazoo Cnty*, 390 F.3d 890, 895 (6th Cir. 2004)). This prong is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore*, 390 F.3d at 899. That said, "[e]ven if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear." *Adams v. Harju*, No. 2:20-cv-100, 2020 WL 4692903, at *3 (W.D. Mich. Aug. 13, 2020).

The subjective component requires a showing that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). "[A] complaint that a physician has been negligent in diagnosing or treating [an inmate's] medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle v. Gamble*, 420 U.S. 97, 106 (1976). Likewise, an inmate's mere disagreement with a prison physician over diagnosis or treatment does not give rise to an Eighth Amendment claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *see also Gabehart v. Chapleau*, No. 96-5050, 110 F.3d 63 (Table), 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997) ("Misdiagnoses, negligence, and malpractice are not … tantamount to deliberate indifference.").

The Sixth Circuit thus distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). In cases where an inmate has received some medical attention but challenges its adequacy, the inmate must show that the care he received was "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (requiring that an inmate alleging deliberate indifference "must show that his treatment was 'so woefully

30

inadequate as to amount to no treatment at all'") (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

### 3.2.2.2 Medical Deliberate Indifference Analysis

Returning to this case, Smith asserts in count ten that he did not receive "proper care" from an on-duty nurse who cleared him after the March 2022 incident. Doc. 6, at 18. Even assuming that his injuries from the altercation were serious enough to require medical attention, however, Smith does not explain why the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller*, 408 F.3d at 819. On the night of the altercation, the nurse cleaned Smith's wrist wound, applied a bandage, wrapped his left bicep, and provided medication for discomfort. Doc. 91-2, at 37. Sloan, who examined him two weeks later, did not find "any … condition that required referral to a specialist or examination by a physician." Doc. 91-6, at 2. By that time, Smith had also regained "full range of motion" and did not show any weaknesses in his limbs. Doc. 91-6, at 2. To the extent that Smith invites this Court to second-guess the judgment of trained medical personnel, this Court declines that invitation. *See Mitchell*, 553 F. App'x at 605 ("[A] desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim.").

For the medical care Smith received after the September 2023 attack, alleged in count 11, the Court reaches the same conclusion. There is no evidence that Smith suffered an objectively serious medical need "obvious even

31

to a lay person" at the time. *Blackmore*, 390 F.3d at 899. When a nurse examined Smith immediately following the attack, Smith denied having any injury or pain and refused to undergo any further examination. Doc. 91-2, at 27. The nurse noted that Smith "was fully conscious," Doc. 91-7, at 2, and did not observe any bleeding, physical injuries, or "signs or symptoms of a concussion or other head injury." Doc. 91-7, at 1. Absent evidence of an obvious medical need, Smith fails to establish the objective prong of his deliberate indifference claim.

Smith also cannot establish that the care he received was "grossly incompetent" or "inadequate." *Miller*, 408 F.3d at 819. The examining nurse explained that she "did not call for a physician or refer Smith to a physician because there was no medical justification." Doc. 91-7, at 2. She also attests that if she "observed bruising, bleeding, or any serious sign/symptom, [she] would have called for a physician," even though Smith denied any injury or pain. Doc. 91-7, at 1–2. Smith presents nothing to counter this evidence. Considering that Smith denied any injury or pain following the assault, and that the nurse similarly observed no bruising or bleeding, Smith has failed to "show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh*, 643 F.3d at 169).

32

*3.2.2.3 First Amendment Claims*

The Court next turns to Smith's First Amendment claims regarding grievance restrictions, retaliation, and confiscation of legal materials.

> 1. Counts 5 and 12: Defendants' grievance restrictions did not violate Smith's First Amendment rights

Smith contends that Defendants Booth and Lambert initially violated his First Amendment rights by imposing and approving a 90-day grievance restriction in April 2022, and that Defendants Blakenship and Lambert did the same in September 2023. Doc. 6, at 16, 18. Smith further contends that Chambers-Smith violated Smith's First Amendment rights by ratifying both restrictions. Doc. 6, at 16, 18.

The grievance restrictions at issue did not directly violate Smith's First Amendment rights. While "[a]n inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf," *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000), "the right to file grievances is protected only insofar as the grievances are not 'frivolous,'" *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018) (quoting *Herron*, 203 F.3d at 415). "Consequently, denying access to a grievance process, in itself, is not a constitutional violation." *Paolone v. Altiere*, No. 4:12-cv-1344, 2012 WL 5463871, at *2 (N.D. Ohio Nov. 8, 2012). Indeed, "[c]ourts in this [C]ircuit have consistently upheld procedures which modify or restrict the ability of prisoners (who have been deemed abusive grievance filers) to file unfettered grievances." *Odom v. Helton*, No. CIV.A. 12-80, 2013 WL 4012889, at *7 (E.D. Ky. Aug. 6,

2013). Moreover, "[a] prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415–16 (6th Cir. 2014) (quoting *N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)).

Here, even under the 90-day grievance restrictions, Smith maintained "unrestricted access to the kite system" and had "staff available to [him] as they ma[d]e rounds daily." Doc. 91-2, at 17, 21; *see Pullen v. Combs*, No. 1:17-cv-255, 2020 WL 419947, at *8 (S.D. Ohio Jan. 27, 2020) (granting summary judgment after finding a similar grievance restriction did not violate the inmate's First Amendment rights), *report and recommendation adopted*, 2020WL 1451564 (S.D. Ohio Mar. 25, 2020). Blankenship further declared that if Smith "had a valid grievance … he could have submitted a kite to the institutional inspector's office and requested permission to grant a single complaint." Doc. 91-5, at 2. Other courts have held that imposing similar restrictions "does not impinge upon a prisoner's ability to file meritorious grievance in prison" and therefore does not violate the First Amendment. *Hoffmeyer v. Rose*, No. 1:10-cv-2588, 2011 WL 834059, at *2 (N.D. Ohio Mar. 4, 2011). Moreover, despite the restrictions, Smith retained "other means of exercising his right to petition government for redress of grievances," such as

filing this lawsuit. *Gonzalez v. Maki*, No. 2:22-cv-4, 2022 WL 819190, at \*2 (W.D. Mich. Mar. 18, 2022).

> 2. Counts 7 and 13: Defendants' grievance restrictions did not constitute retaliation.

In the alternative, Smith claims that the grievance restrictions constituted retaliation in response to his exercise of his First Amendment rights. This claim fares no better than Smith's direct First Amendment claims. To prevail on a retaliation claim, a plaintiff must show that: (1) he "engaged in protected conduct"; (2) he faced an "adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The inmate must also show that "the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). Once the inmate meets these requirements, the burden of production shifts to the defendant, who must show by preponderance of evidence that he would have taken the same action regardless of the inmate's protected activity. *See Maben*, 887 F.3d at 262; *Thaddeus-X*, 175 F.3d at 399.

Smith's retaliation claim fails at the outset because abusing a grievance system is not protected conduct. *See Griffin*, 563 F. App'x at 416. "[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,'" and his claim cannot proceed in the retaliation analysis. *Thaddeus-*

35

*X*, 175 F.3d at 395. By the same token, a prisoner's First Amendment right to file grievances without retaliation "only extends to the filing of non-frivolous grievances." *Walker v. Michigan Dep't of Corr.*, 128 F. App'x 441, 445–46 (6th Cir. 2005) (citations omitted). Here, Blankenship's declaration establishes that Smith violated the ODRC's grievance rules first by filing "ten … grievances regarding the incident on March 18, 2022," and then submitting "multiple frivolous complaints" to the chief inspector's office. Doc. 91-5, at 2. Blankenship further attested that the subject matter of Smith's grievances "had absolutely no bearing" on either restriction. Doc. 91-5, at 2. In contrast, other than asserting in his amended complaint that he had filed "valid grievances," *see* Doc. 6, at 16–17, 19, Smith fails to identify the specific content or merit of his grievances, Smith's bald assertion alone is not enough to present a genuine dispute of fact or show that Smith engaged in protected conduct. *See Ghandi*, 747 F.2d at 345 ("Plaintiffs … are not entitled 'to get to the jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial'") (quoting *First Nat. Bank of Ariz.*, 391 U.S. at 289–90).

But even assuming that Smith's repeated filing of grievances constituted protected First Amendment activity, Smith still cannot establish that the restrictions at issue constituted an "adverse action" for retaliation purposes. As courts have held, modifying or limiting an inmate's grievance access is not an adverse action for retaliation purposes. *See, e.g., Odom v. McCalister*, No. 5:24-cv-P48, 2024 WL 1776403, at *3 (W.D. Ky. April 24, 2024);

36

*Harris v. Ohio*, No. 1:19-cv-383, 2019 WL 2477354, at \*5 (S.D. Ohio June 3, 2019); *Weatherspoon v. Williams*, No. 2:14-cv-108, 2015 WL 2106401 (W.D. Mich. May 6, 2015). This is because, as the Sixth Circuit has explained, "an ordinary person of reasonable firmness would not be deterred from filing non-frivolous grievances merely because he or she had been placed on modified status." *Walker*, 128 F. App'x at 446; *accord. Warner v. Chambers-Smith*, No. 2:24-cv-1565, 2025 WL 521060, at \*12 (S.D. Ohio Jan. 15, 2025). In this case, Smith had continued access to grievance proceedings for non-frivolous issues, such as medical concerns, by submitting kites to the institutional inspector or speaking directly with institutional staff. Doc. 91-2, at 17, 21; *see Moore v. Sergent*, 22 F. App'x 472, 474 (6th Cir. 2001) (reasoning that because the plaintiff "has not been prevented from continuing to file grievances, he has not been subjected to retaliation"). Moreover, as explained, the grievance restrictions did not deprive Smith of his ability to file federal suits. *See Kennedy v. Tallio*, 20 F. App'x 469, 471 (6th Cir. 2001); *Mims v. Davids*, No. 1:22-cv-232, 2022 WL 1485512, at \*7 (W.D. Mich. May 11, 2022). Because the grievance restrictions neither foreclosed non-frivolous grievances nor impaired Smith's access to federal courts, they do not amount to an adverse action.

> 3. Count 6: Defendants' seizure of legal materials did not constitute retaliation or violate the First Amendment.

In Count 6, Smith asserts two distinct theories arising from the seizure and handling of his legal materials. First, Smith claims that Booth, Lambert, McConahay, and Chambers-Smith denied him access to the courts by seizing

37

and destroying his legal materials. Doc. 6, at 16. Second, Smith claims that Booth retaliated against him by issuing disciplinary tickets when Smith refused to sign an authorization for destroying his legal materials. Doc. 6, at 16. Both theories, however, have no merit.

*Access to Courts*

Inmates have a constitutional right of access to the courts. *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). The Supreme Court has explained that this right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *abrogated in part on a different ground by Lewis v. Casey*, 518 U.S. 343, 351 (1996); *accord. Simmons v. United States*, 974 F.3d 791, 795 (6th Cir. 2020). A document is considered legal material if it "'implicate[s] the right to petition for grievances and the right of access to the courts.'" *Am. C.L. Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 643 (6th Cir. 2015) (quoting *Jones v. Caruso*, 569 F.3d 258, 268 (6th Cir. 2009)).

To establish a violation of this right, however, an inmate must demonstrate an "actual injury" by showing that a prison official's conduct hindered the pursuit of a nonfrivolous legal claim. *See Lewis*, 518 U.S. at 351; *Fort v. Weirich*, No. 3:24-cv-1644, 2026 WL 864205, at *8 (N.D. Ohio Mar. 30, 2026). "Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing

38

a court-imposed deadline." *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005). Furthermore, the requisite injury "must relate to the rejection of a non-frivolous direct appeal, habeas corpus petition, or civil rights action." *Paolone*, 2012 WL 5463871, at *2; *see Thaddeus-X*, 175 F.3d at 391 ("[A] prisoner's right to the access the court extends to direct appeals, habeas corpus applications, and civil rights claims only."). "Impairment of any other litigating capacity is simply one of the incidental, and perfectly constitutional, consequences of conviction and incarceration." *Lewis*, 518 U.S. at 355. In sum, the constitutional right of access to courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Here, Smith has made no showing of actual injury. Although Smith initially told Booth that his legal materials were about "pending court appeals and cases," Doc. 68-45, at 16, Smith has never identified any of his pending legal actions at the time of the seizure. Indeed, even though the Supreme Court requires that "the underlying cause of action … is an element that must be described in the complaint," *Christopher*, 536 U.S. at 415, Smith's complaint does not meet this threshold. In his amended complaint, Smith merely alleges: "Booth had in her possession a large locker box confiscated from [his] cell the night of the stabbing incident, which was full of [Smith's] legal document, court files[,] and law books." Doc. 6, at 10.

Nor does Smith present any evidence that the seized legal materials could make any difference in his pending lawsuit. *See Sampson v. Garrett*, 917 F.3d 880, 882 (6th Cir. 2019) (explaining that an inmate "could prevail on that claim only if he showed that the information could make a difference in a nonfrivolous challenge to his convictions."); *see also Pederaz v. Currier*, No. 1:23-cv-1286, 2023 WL 6258624, at *5 (N.D. Ohio Sept. 26, 2023) (dismissing an access to court claim when the plaintiff failed to show that Defendants' placement of incorrect postage on envelopes prejudiced him in the other pending litigation). Because Smith does not show that the seizure of the legal materials prevented him from pursuing of a non-frivolous legal action or caused the rejection of that action, this Court grants summary judgment for Defendants on Smith's access to the courts claim.

### *Retaliation*

Smith's allegation that Booth retaliated against him by issuing a conduct report is equally unavailing. Doc. 6, at 16. To begin, "[t]he act of writing a conduct report, alone, is insufficient to constitute an adverse action." *Quinn v. Retort*, No. 4:18-cv-2615, at *8 (N.D. Ohio Sept. 28, 2020). "Erroneous or even fabricated allegations of misconduct by an inmate, standing alone, do not constitute a deprivation of a constitutional right." *Id.*; *Reeves v. Mohr*, No. 4:11-cv-2062, 2012 WL 27566, at *2 (Jan. 31, 2012). Moreover, other than making "conclusory allegations of retaliatory motive," *Harbin-Bey*, 420 F.3d at 580, Smith presents no evidence from which a reasonable jury could infer that his disciplinary tickets were motivated by retaliatory animus in response to

40

his exercising of his constitutional right, *see Thaddeus-X*, 175 F.3d at 386 (explaining that an inmate alleging retaliation must show that the adverse action at issue was "motivated in substantial part by a desire to punish [the inmate] for exercise of a constitutional right"); *see also* Doc. 91, at 16–17 (arguing that Smith's claim is based only on conclusory allegations). Rather, the uncontroverted evidence demonstrates that Smith possessed multiple items bearing other inmates' names and later made threatening remarks to Booth. Doc. 91-2, at 25–26. Possessing contraband and showing disrespect towards prison personnel violate the inmate rules of conduct. *See* Ohio Admin. Code 5120-9-06(C)(32), (46). Because Defendants have showed that they would have issued the tickets regardless of Smith's refusal to sign the authorization form, the retaliation of count six fails. *Thaddeus-X*, 175 F.3d at 399.

### Conclusion

For all the reasons stated, the Court grants Defendants' motion for summary judgment and denies Smith's motion for preliminary injunction as moot. The Court also denies Smith's motion for summary judgment.

Dated: August 5, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

41